# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JOE J. PADILLA,

      Plaintiff,

v.                                                                                              No. CIV 97cv1694 JC/JHG

KENNETH S. APFEL,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

This matter is before the Court on Plaintiff's (Padilla's) Motion to Reverse and Remand Administrative Decision, filed September 25, 1998. The Commissioner of Social Security issued a final decision denying Padilla's application for supplemental security income. The United States Magistrate Judge, having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, finds the motion is well-taken in part and recommends that it be GRANTED.

Padilla, now fifty-seven years old, filed his application for supplemental security income on October 29, 1993, alleging a disability which commenced October 15, 1993, due to back fracture, seizures, and numbness in his right lower extremity. He has an eleventh grade education with past relevant work experience as a cook, bartender, cashier and clerk. Padilla last worked in 1987. The Commissioner denied Padilla's application for disability insurance benefits both initially and on reconsideration. After conducting an administrative hearing, the Commissioner's Administrative Law Judge (ALJ) found Padilla had the residual functional capacity for light work and was a person closely approaching advanced age. Applying the grids, the ALJ concluded Padilla was not disabled. The

Appeals Council denied Padilla's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Padilla seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f) (1993). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and

2

416.920 (1993). At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse and remand, Padilla argues the ALJ's finding he can perform light work is not supported by substantial evidence, the ALJ improperly disregarded the opinions of his treating physicians, the ALJ erred as a matter of law in applying the grids at step five, and the ALJ erred as a matter of law in failing to consider his inability to afford treatment as a justifiable cause for his failure to follow prescribed treatment.

The record reveals that Padilla suffered a seizure in 1981. Administrative Record (AR) at 89. Dr. Baten diagnosed a generalized seizure disorder, placed Padilla on Dilantin and advised him to stop consuming alcohol. AR 92-96. On June 1, 1981, Padilla returned for a follow up visit with Dr. Baten. AR 171. Dr. Baten found he was doing well and had quit drinking. *Id.* On December 2, 1981, Dr. Baten again found Padilla was doing well, had not suffered any seizures, and was not having any problems with Dilantin. *Id.*

On November 9, 1982, Dr. Baten noted Padilla had not had a seizure for about a year. AR 167. He was taking Dilantin with no adverse effects. *Id.* Padilla had quit drinking. *Id.* On November 8, 1983, Dr. Baten noted Padilla had suffered no seizures in almost two years, his clinical situation was stable, he was taking Dilantin, and he was not drinking on a regular basis. AR 167.

On October 15, 1993, Dr. Baten admitted Padilla to St. Vincent's Hospital after he suffered a seizure, fell and sustained a compression fracture at L1. AR 101; 125-129. On October 19, 1993, Padilla underwent back surgery. AR 100. After the second post-operative day, Padilla developed complications and underwent additional surgery. AR 100;116. After considering several courses of

treatment, the physicians opted to place Padilla in bed rest in an effort to achieve spontaneous fusion of the broken vertebra. AR 99. After six weeks of bed rest, his neurological deficit was completely resolved. *Id.* On December 14, 1993, he was discharged, placed on Dilantin and advised to follow up with physical therapy. *Id.*

On February 4, 1994, Dr. Baten again admitted Padilla to the hospital following a series of seizures at home. AR 131-141. Dr. Baten determined the seizures were probably due to low Dilantin levels. AR 141. Padilla's Dilantin level was 9.6. AR 141. Spine x-rays revealed fusion at T12-S1. AR 131-137. At the time of discharge, Padilla was neurologically stable and normal. AR 131. Dr. Baten stated Padilla should follow up with him in a week to check his Dilantin levels. *Id.*

On February 14, 1994, Dr. Baten saw Padilla for follow-up. AR 174. Padilla denied any pain but reported some numbness and tingling of the right lower extremity. *Id.* Dr. Baten stated that overall, Padilla was doing well. *Id.* On March 14, 1994, Dr. Baten found Padilla was ambulating well and continuing to improve. *Id.*

On May 14, 1994, Dr. Baten admitted Padilla to the hospital in the wake of repetitive serial seizures. AR 147-161. Dr. Baten found his Dilantin level was either supra-therapeutic or sub-therapeutic. AR 147;160. Dr. Baten continued the Dilantin, and also started Padilla on Depakote. *Id.* Dr. Baten advised Padilla to desist from alcohol and follow up within seven to ten days to check on the drug levels. AR 147. An EEG was diffusely abnormal. AR 155-156. A CT taken scan on the same date was normal. AR 157.

On June 15, 1994, Dr. Baten reported Padilla was having difficulty obtaining his medication. AR 198. On June 23, 1994, Dr. Baten found Padilla was doing quite well with Dilantin and Depakene. AR 196. Dr. Baten gave him a couple weeks supply of the medications and planned to

4

attempt to find him an additional supply. *Id.*

On May 26, 1994, Dr. Baten wrote Padilla suffered from a severe, intractable epileptic condition with frequent seizures and lower limb weakness as a result of a spinal fracture cause by a seizure. AR 164. Dr. Baten opined Padilla was disabled for a period of twelve months. *Id.* On August 3, 1994, Dr. Baten wrote that Padilla had intractable epilepsy and his seizures in the past had been quite severe. AR 163. On March 9, 1995, Dr. Baten wrote Padilla was doing well and had not had a seizure since May, 1994. AR 246. Padilla continued to have a lot of back pain and walked slowly, with intermittent numbness in his right lower extremity. *Id.*

On April 18, 1994, Dr. Abram wrote he had treated Padilla for his L1-T12 compression fracture with bracing and bed rest after surgery failed. AR 173. Dr. Abram reported Padilla was ambulating well, continued to improve, had problems reconditioning and was disabled. *Id.* On August 3, 1994, Dr. Abram wrote Padilla was doing well, had stopped wearing the brace and had been involved in rehabilitation. AR 172.

At the administrative hearing of March 3, 1995, Padilla testified Dr. Abrams told him he could not see him unless he came up with some money to pay his bill. AR 264. Padilla testified he could lift 20 to 25 pounds, drank a beer a day, and smoked about a half a pack of cigarettes. AR 262. He also testified he might be able to do a job which provided him the opportunity to switch between sitting and standing. AR 264.

Padilla argues the ALJ's finding he can perform light work is not supported by substantial evidence. In support of this argument, Padilla submits the ALJ did not properly analyze the conflicting evidence and took the treating physicians' reports out of context. Light work involves lifting no more than twenty pounds at a time, with frequent lifting and carrying of objects weighing up to ten pounds.

5

20 C.F.R. §404.1567 (b) (1993). Although the weight lifted may be very little, this category includes jobs which require a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm and leg controls. *Id.*

In arriving at his determination that Padilla retained the residual functional capacity to perform a wide range of light work, the ALJ relied on the records and reports of Dr. Baten and Dr. Abrams, as well as Padilla's own testimony. AR at 13-15. Dr. Baten found Padilla was doing well overall and continued to improve. AR 174. Dr. Abram reported Padilla was ambulating well, continued to improve, stopped wearing the brace and had been involved in rehabilitation. AR 172-173. Padilla testified he could lift 20 to 25 pounds and might be able to do a job which provided him the opportunity to switch between sitting and standing. AR 262-264. On a Social Security Administration form, Padilla stated he was able to wash dishes and perform very light house work. AR 77.

In applying the substantial evidence standard, this court is not free to reweigh the evidence or substitute its judgment for that of the ALJ. *Glass v. Shalala*, 43 F.3d at 1395. This court may not reverse the ALJ merely because there is also evidence which supports the claimant. *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992). The ALJ analyzed the medical evidence and testimony and concluded Padilla retained the residual functional capacity to perform a wide range of light work, not involving unprotected heights, climbing or dangerous machinery. The medical records and physician's reports, as well as Padilla's testimony, are substantial evidence which support the ALJ's finding that Padilla retained the residual functional capacity to perform a wide range of light work, limited by his seizure disorder. Therefore, Padilla's first argument is without merit.

Padilla also contends the ALJ failed to accord the proper weight to the opinions of Dr. Baten and Dr. Abram. In his May 26, 1994 letter, Dr. Baten opined Padilla was disabled for a period of

twelve months. AR 164. In his April 18, 1994 letter, Dr. Abram wrote Padilla was ambulating well, continued to improve, had problems reconditioning and was disabled. AR 173.

A treating physician's opinion is generally entitled to substantial weight. *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987). However, a treating physician's opinion may be disregarded if it is not supported by specific findings or if it is inconsistent with other substantial evidence in the record. *Castellano v. Secretary*, 26 F.3d 1027, 1029 (10th Cir. 1994).

In determining the appropriate weight to give any medical opinion, the ALJ must consider the following specific factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by substantial evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Goatcher v. U.S. Dept. of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995)(citing 20 C.F.R. § 404.1527(d)(2)-(6)).

In this case, the ALJ rejected these isolated opinions of Dr. Baten and Dr. Abram because the record did not contain objective medical evidence which confirmed these conclusions and the opinions were not supported by the doctors' own findings or other findings of record. Tr. 13-14. These were appropriate and legitimate reasons to discount the opinions of Dr. Baten and Dr. Abram on the ultimate issue that Padilla was disabled. Moreover, substantial evidence supports the ALJ's decision in this regard. Therefore, Padilla's second argument is also without merit.

Padilla next argues the ALJ erred as a matter of law in applying the grids at step five. At step

7

five, the burden of proof shifts to the Commissioner to show that the claimant retains the residual functional capacity to do work which exists in the national economy. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). In certain cases, at the fifth step, the ALJ may rely solely on the grids.

The grids reflect the existence of jobs in the national economy at various residual functional levels by incorporating administrative notice of occupational publications and studies. 20 C.F.R. § §404.1566(d); 416.969a (1993). The grids aid the Commissioner in determining what specific jobs exist in the national economy for the claimant. To apply the grids, the ALJ must make findings of fact as to age, education, work experience, and residual functional capacity. 20 C.F.R. §§404.1545, 404.1563-.1565; 416.969a (1993). These findings of fact are plugged into the grids to produce a factual conclusion of disability. 20 C.F.R. §§ 404.1569; 416.969a (1993).

The grids assume that a claimant's sole limitation is lack of strength, also known as an exertional impairment. 20 C.F.R. Part 404, Subpt. P, App. 2, §200.00 (e)(2) (1993). In a case such as this, where a claimant presents evidence of both exertional and non-exertional impairments, the ALJ must make findings on how much a claimant's work ability is further diminished by the non-exertional limitations. *Id.* If the non-exertional limitations are significant enough to further reduce work capacity, the ALJ may not rely solely on the grids but must instead give full consideration to all relevant facts, including expert vocational testimony if necessary, in order to determine whether a claimant is disabled. *Channel v. Heckler*, 747 F.2d 577, 583 (10th Cir. 1984).

In other words, the grids cannot be used conclusively when a non-exertional impairment limits a claimant's ability to perform the full range of work in a particular residual functional capacity category. *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). When non-exertional limitations are present, the grids can only be used as a framework for considering the extent to which such

limitations further diminish the claimant's ability to work by reducing the types of jobs that the claimant would otherwise be able to perform. *Talbot*, 814 F.2d at 1460; 20 C.F.R. Pt. 404, Subpt. P., App. 2, § 200.00 (e)(2). In assessing the extent to which a claimant's ability to work is eroded by his non-exertional impairments, the ALJ will normally need to obtain the testimony of a vocational expert. *Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir. 1991).

In this case, the ALJ found Padilla's ability to perform light work was limited to work that did not involve unprotected heights and dangerous machinery due to his seizure impairment. AR 12. The Court is mindful that Social Security Ruling 85-15 directed the ALJ to find a seizure disorder which only imposed restriction of unprotected elevation and proximity to dangerous, moving machinery did not sufficiently erode the vocational base enough to preclude reliance on the grids. However, more recent unpublished Tenth Circuit authority holds to the contrary. *Walton v. Dept. of Health and Human Services,* 48 F.3d 1233 (10th Cir. Feb. 28, 1995)(Table, Text in WestLaw, No. 94-5142). Under the circumstances, the Court should apply the same analysis as that applied by the Tenth Circuit.

Following the analysis of *Walton*, Padilla's seizure impairment eliminates his ability to perform jobs that involve unprotected heights or dangerous machinery. Accordingly, the ALJ could not properly determine whether Padilla was disabled by relying solely on grids. Therefore, the case must be remanded in order to obtain vocational expert testimony at step five.

Padilla also argues the ALJ erred as a matter of law in failing to consider his inability to afford treatment as a justifiable cause for his failure to follow prescribed treatment. An inability to pay may justify a claimant's failure to seek treatment. *Thompson v. Sullivan*, 987 F.2d at 1489-90. The decision of the ALJ does not address this point. On remand, the ALJ should consider Padilla's

assertion that any failure to follow prescribed treatment was caused by his inability to pay for treatment.

## RECOMMENDED DISPOSITION

The ALJ did not apply correct legal standards and his decision is not supported by substantial evidence. Padilla's Motion to Reverse and Remand Administrative Decision, filed September 25, 1998, should be granted. This case should be remanded in order to obtain vocational expert testimony at step five and consideration of whether any failure to follow prescribed treatment is attributable to an inability to pay.

JOE H. GALVAN
UNITED STATES MAGISTRATE JUDGE

## NOTICE

Within ten days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to 28 U.S.C. § 636 (b)(1), file written objections to such proposed findings and recommended disposition. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.